# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| **SW NASHVILLE EB OWNER, LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | **Case No. 3:24-cv-00710** |
| **METROPOLITAN GOVERNMENT OF** | ) | **Judge Aleta A. Trauger** |
| **NASHVILLE AND DAVIDSON** | ) | |
| **COUNTY, TENNESSEE; and LUCY** | ) | |
| **KEMPF, EXECUTIVE DIRECTOR OF** | ) | |
| **THE METROPOLITAN NASHVILLE-** | ) | |
| **DAVIDSON COUNTY PLANNING** | ) | |
| **DEPARTMENT,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM

Plaintiff SW Nashville EB Owner, LLC ("Owner") brings suit against the Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro") and Lucy Kempf, Executive Director of the Metro Planning Department ("Planning Department"), in both her official and individual capacity, raising various federal and state constitutional claims based on the Planning Department's failure to issue a building permit to Owner. Now before the court are Motions to Dismiss filed by both Metro (Doc. No. 24) and Kempf (Doc. No. 26).

For the reasons set forth herein, both motions will be granted. The plaintiff's takings and due process claims will be dismissed as unripe; the remaining claims will be dismissed for failure to state a claim for which relief may be granted.

## I.    FACTS AND PROCEDURAL HISTORY

### A.    Alleged Facts

As explained below, the operative pleading is the plaintiff's Second Amended Complaint ("SAC") (Doc. No. 44). The relevant, well pleaded facts set forth therein are fairly straightforward. Owner owns a tract of land identified as 186 North 1st Street, Nashville, Tennessee 37213 (the "Property"). (SAC ¶ 4.) It purchased the Property in 2022 "after undertaking extensive due diligence." (*Id.* ¶ 9.) At the time of acquisition and now, the Property was and is occupied by a single vacant, dilapidated, uninhabitable building. (*Id.* ¶ 10.)

Owner acquired the Property with the intention of developing it, specifically by constructing a multi-family residential project ("Project") on it. (*Id.* ¶ 11.) Owner successfully raised funds from various investors for this purpose and is now "incurring significant carrying costs" in connection with that effort. (*Id.*) The Property is located in an area zoned "MUG-A," which allows for a mix of residential, retail, and office uses. (*Id.* ¶ 12.) Multi-family residential development is "permitted by right" in the MUG-A zoning district. (*Id.* ¶ 13 (citing Nashville Municipal Code ("Code") § 17.08.030).)

Beginning sometime during the first half of 2022, Owner submitted a permit application ("Application") to the Zoning Division of the Metro Codes Department, seeking approval to construct the Project on the Property. According to a letter attached as an exhibit to the First Amended Complaint, Owner "filed for a grading permit in April of 2022 and a final site plan approval on June 2, 2022." (Doc. No. 13-1 at 1.) Because the intended development was permitted by right, Owner expected a permit to be issued "within a reasonable period of time," in accordance with the procedures outlined in the Code. (SAC ¶¶ 13–14.) Based on how the process "normally works," Owner expected to begin work on the Project within twelve months of submitting the Application. (*Id.* ¶ 15.)

Notwithstanding this expectation, Owner alleges that the "defendants," collectively, informed it that "a Planning Commission staff member had put an indefinite 'hold' on the Property that prohibited review of the Application." (*Id.* ¶ 16; *see also* Doc. No. 24-1 at 3 (June 14, 2022 email from architect Dallas Caudle to Hollingsworth, stating he had been told by Joey Hargis, with whom he was working in the Zoning Division to obtain a building permit for the Project, that Hollingsworth "had a 'Hold' on the property with the notation to 'not approve building permit without planning review'").) Owner then received a confirmatory email from "Defendants," dated June 29, 2022, stating:

> In response to your request for building permit submission to the Metropolitan Codes Department, at this time Metro Government is working in partnership with the Tennessee Department of Transportation (TDOT) to assess possible routes for a planned major roadway in the vicinity of your property. Depending on the outcome of that assessment, the Metropolitan Government may need to acquire right of way interests along the selected route and must defer review of building permits on potentially affected properties until the assessment is complete. The Metropolitan Government will be in contact with you as soon as the assessment and planning processes are complete to discuss the findings and next steps.

(SAC ¶ 17; *see also* Doc. No. 24-1 at 1.) The email appears to have been sent from Michelle Hollingsworth's email account, but it was signed electronically by Benjamin L. York, with the Nashville Department of Transportation, in his capacity as a member of the "East Bank Program Management Team." (Doc. No. 24-1 at 1.)

After receiving this email, Owner "began extraordinary efforts to work with Metro and Planning Commission employees (including defendant Kempf) in hopes of getting the Application moving again." (SAC ¶ 18.) Kempf, as the Executive Director of the Planning Department, allegedly "oversees development permitting in the Metro area." (*Id.* ¶ 6.) The SAC contains no details about the plaintiff's efforts or Kempf's involvement. It simply states that, despite the "clear, nondiscretionary standards that should have applied to Plaintiff's by-right Application," "Defendants" continued to delay review of the Application, repeatedly asking Owner to be

"patient," repeatedly assuring Owner that a decision would be made "imminently," and then reneging on such assurances. (*Id.* ¶ 18.)

In October 2023, Owner sent a letter to Bob Mendes, Metro's Chief Development Officer, asking for his assistance. (*Id.* ¶ 19; *see also* Doc. No. 13-1.) This letter lays out in some detail Owner's efforts to obtain approval to develop the Property, stating that, after Owner filed its Application for "final site plan approval on June 2, 2022," it received an "official response from Metro" that a "hold" had been placed on its Application "because Metro Government *may* need to acquire right of way interests along potentially affected properties." (Doc. No. 13-1 at 1 (emphasis in original).) The letter explains that Owner had begun working with "Metro Planning" even before acquiring the Property, to "coordinate and accommodate the potential East Bank Boulevard through" the Property, even altering the site plan based on feedback regarding the "intended boulevard route," before learning that the "conceptual routing" had changed again and was slated to go through the middle of the Property. (Doc. No. 13-1 at 1.)[1] The letter outlines efforts Owner had made in meetings and calls with Nashville Department of Transportation and "Planning" employees to obtain concrete answers, to no avail. The letter highlights the untenable "limbo" in which Owner had been placed and requested a meeting with Mendes to "discuss how and when Metro will be held accountable to an actionable timeline." (*Id.* at 2.)

This letter resulted in a meeting between Mendes and Owner's representatives in November 2023, during which Mendes simply told Owner's representatives that "Metro was still working on the issue and that they should continue to be patient." (SAC ¶ 20.) Then, on April 1,

---

[1] The dates set out in this letter, indicating that Owner began working with Metro in 2020 and purchased the Property in 2021, are at odds with the FAC's allegation that Owner acquired the Property in 2022. (Compare SAC ¶ 9 *with* Doc. No. 13-1 at 1.) The court presumes that the dates in the SAC are correct.

2024, "Defendants" gave Owner "notice of proposed acquisition of a portion of the Property for purposes of the planned roadway, presumably in advance of eminent domain proceedings and a monetary offer," but no eminent domain proceedings have been initiated. (*Id.* ¶ 31.)

Otherwise, nothing has changed since Owner's meeting with Mendes in October 2023—or, indeed, since it first received notice in June 2022 that its Application was on hold. As of the date of filing the SAC, the "hold" remained in effect, rendering the Property undevelopable, unsellable, and "worthless for the duration of the 'hold.'" (*Id.* ¶¶ 21, 27.)

The remainder of the "Background" section of the SAC consists largely of legal argument.[2] Owner asserts that, even if Metro had taken steps to issue a formal "moratorium" on development in the area where the Property is situated, rather than an informal "hold" on development, such a moratorium would have been invalid because Owner's proposed development is permitted by right—meaning, according to Owner, that Metro has no discretion as to whether to grant a development permit. It "*must* authorize the development if Plaintiff satisfies the Code's development requirements," and Metro does not contend that Owner's application has been held up because of noncompliance. (*Id.* ¶ 23.) Owner asserts that the delay in this case, which is purportedly based on the possible future need for "right of way interests," constitutes an unconstitutional taking, irrespective of whether the taking is temporary or permanent in nature. (*Id.* ¶¶ 23–26.) It asserts that the "wrongful conduct was not a single act or decision"; instead, in response to Owner's "regular communications requesting action or information, Defendants continually refused to act while inducing Plaintiff to forbear from taking any legal action of its

---

[2] The plaintiff's citations to opinions regarding unconstitutional conditions are irrelevant as it does not actually allege that Metro has attempted to impose unconstitutional conditions on the granting of the building permit. Rather, it has simply delayed review of Owner's Application.

own." (*Id.* ¶ 28.) Owner asserts that Metro's delay in taking action on its application is "extraordinary," resulting in new damages each day the hold persists. (*Id.* ¶ 29.)

**B.     Procedural History**

Owner filed suit in state court on May 3, 2024, bringing inverse condemnation,[3] substantive and procedural due process, and equal protection claims against both Metro and Kempf (in her individual and official capacity) in violation of the United States and Tennessee Constitutions. (Doc. No. 1-1.) After the defendants removed the case to this court and filed their first (joint) Motion to Dismiss, Owner filed the First Amended Complaint ("FAC"), clarifying its claims. (Doc. No. 13.) The court denied the first Motion to Dismiss as moot in light of the filing of the FAC, and the defendants thereafter filed the separate Motions to Dismiss that are now pending, along with supporting Memoranda of Law arguing that all claims against them are subject to dismissal under Federal Rule of Civil Procedure 12(b)(6). (Doc. Nos. 24–27.) Owner filed Responses in opposition to each motion, and the defendants filed Reply briefs. (Doc. Nos. 30, 31, 34, 35.)

The plaintiff thereafter sought and was granted leave to file the SAC. Although the defendants initially opposed this filing, the plaintiff submitted a revised SAC and the parties jointly submitted an Agreed Order, agreeing that the SAC, as revised, "clarifies and narrows the issues to be litigated" and otherwise modifies the FAC only by (1) clarifying that the plaintiff's inverse condemnation claim sounds against Metro only and (2) dropping the Tennessee constitutional

---

[3] Inverse condemnation is "a cause of action against a governmental defendant to recover the value of property which has been taken in fact by the governmental defendant." *Knick v. Twp. of Scott*, 588 U.S. 180, 186 (2019) (quoting *United States v. Clarke*, 445 U.S. 253, 257 (1980)). A direct condemnation action is one in which "the government initiates proceedings to acquire title under its eminent domain authority." *Id.*

claims against Kempf. (*See* Doc. No. 43 at 2.) They also agreed that the filing of the SAC did not moot the already pending Motions to Dismiss or the briefing on those motions. (*See id.* at 2–3.)

## II.     STANDARD OF REVIEW

### A.     Rule 12(b)(6)

A motion to dismiss pursuant to Rule 12(b)(6) tests the legal sufficiency of the complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). Such a motion is properly granted if the plaintiff has "fail[ed] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6); *Marvaso v. Sanchez*, 971 F.3d 599, 605 (6th Cir. 2020). In ruling on a motion to dismiss under Rule 12(b)(6), the court must "construe the complaint in the light most favorable to the plaintiff, accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

To survive a motion to dismiss, a complaint must allege facts that, if accepted as true, are sufficient to state a claim to relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–57 (2007); *see also* Fed. R. Civ. P. 8(a)(2). A complaint has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). The complaint need not contain "detailed factual allegations," but it must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555 (2007). A complaint that "tenders 'naked assertions' devoid of 'further factual enhancement'" will not suffice. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 557).

Generally, if "matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d).

At the same time, however, it has long been the rule that a court may consider not only the complaint and exhibits attached to it, but also exhibits attached to a defendant's motion to dismiss, "so long as they are referred to in the Complaint and are central to the claims contained therein." *Brent v. Wayne Cty. Dep't of Human Servs.*, 901 F.3d 656, 694 (6th Cir. 2018) (citation omitted). A court may also consider public records without converting a Rule 12(b)(6) motion into a Rule 56 motion. *Jones v. City of Cincinnati*, 521 F.3d 555, 562 (6th Cir. 2008) (citation omitted).

"[W]hen evaluating an affirmative defense in a motion to dismiss, a court must . . . only look to the facts alleged in the plaintiff's complaint, albeit alongside the legal elements of the affirmative defense raised in the defendant's motion to dismiss." *Goins v. Saint Elizabeth Med. Ctr.*, 640 F. Supp. 3d 745, 751 (E.D. Ky. 2022) (citing *Hensley Mfg. v. ProPride, Inc.*, 579 F.3d 603, 613 (6th Cir. 2009)). "If the elements of an affirmative defense are met by the factual allegations contained in the complaint, then the district court may grant the motion to dismiss." *Id.*; *see also Kreipke v. Wayne State Univ.*, 807 F.3d 768, 784 (6th Cir. 2015) ("Where an affirmative defense appears 'clearly on the face of the complaint,' however, a court may dismiss a complaint under Rule 12(b)(6) for failure to state a claim.").

### B.    Subject Matter Jurisdiction

Where a plaintiff's claims are unripe, such unripe claims "[t]ypically . . . raise a jurisdictional issue," meaning that "federal courts lack subject matter jurisdiction and the [claims] must be dismissed." *Doe v. Oberlin Coll.*, 60 F.4th 345, 355 (6th Cir. 2023) (quoting *Arnett v. Myers*, 281 F.3d 552, 562 (6th Cir. 2002)). The federal courts "must *sua sponte* police [their] own jurisdiction." *Ohio v. Doe*, 433 F.3d 502, 506 (6th Cir. 2006); *see also Eaton v. Charter Twp. of Emmett*, 317 F. App'x 444, 451 (6th Cir. 2008) (affirming the district court's *sua sponte* dismissal of takings claim as unripe).

### III.    DISCUSSION

#### A.    Metro's Motion to Dismiss

Metro seeks dismissal of all claims set forth against it under Rule 12(b)(6), for failure to state a claim for which relief may be granted, arguing that: (1) all claims set forth in the SAC are subject to a one-year statute of limitations that accrued, at the latest, in July 2022—more than a year before the filing of the original Complaint—and are therefore time-barred; (2) the state law claims fail because Tennessee does not recognize a private right of action for damages arising from violations of the Tennessee Constitution; (3) the plaintiff's substantive due process claim fails for the independent reason that the SAC does not plead any "arbitrary and capricious" action and instead "improperly repackage[s]" the takings claim as a substantive due process claim; (4) the equal protection claim fails because the plaintiff has not alleged that a similarly situated comparator was treated more favorably; and (5) the claims under 42 U.S.C. § 1983 fail generally, because the plaintiff has not pleaded that a "custom, policy, or practice" of the municipality caused the alleged constitutional violations.

As set forth below, the court finds that (1) the Tennessee courts have not recognized the existence of a private cause of action for violation of the Tennessee Constitution, requiring dismissal of all of the plaintiff's state law claims (other than its state law takings claim); (2) the SAC fails to plausibly allege facts that state a claim for violation of the plaintiff's right to equal protection; and (3) rather than being barred by the statute of limitations, the takings and due process claims are unripe, as a result of which the claims must be dismissed without prejudice for lack of subject matter jurisdiction. The court does not reach the parties' other arguments.

*1. Claims Under Tennessee Constitution*

The plaintiff has clarified that its claims under the Tennessee Constitution are against Metro only. Metro argues that these claims must be dismissed because the Tennessee courts have not recognized a private cause of action for damages for violations of the Tennessee Constitution.

The court agrees. It is firmly established that "Tennessee . . . has not recognized any . . . implied cause of action for damages based upon violations of the Tennessee Constitution." *Siler v. Scott*, 591 S.W.3d 84, 102 & n.2 (Tenn. Ct. App. 2019) (quoting *Bowden Bldg. Corp. v. Tenn. Real Estate Comm'n*, 15 S.W.3d 434, 446 (Tenn. Ct. App. 1999)) (other citations omitted); *accord Cline v. Rogers*, 87 F.3d 176, 179 (6th Cir. 1996) ("The plaintiff can state no claim of a state constitutional violation in this case because Tennessee does not recognize a private cause of action for violations of the Tennessee Constitution." (citation omitted)); *Venable v. Metro. Gov't*, 430 F. Supp. 3d 350, 361 (M.D. Tenn. 2019) (same).

Owner "concedes that courts have held as much" but argues that "those holdings are impossible to square with the plain language of the Tennessee Constitution." (Doc. No. 30 at 16.) That may well be, but this court is bound by the holdings of the Tennessee courts and the Sixth Circuit construing that language. The plaintiff's claims for damages premised upon alleged violations of the Tennessee Constitution will be dismissed for failure to state a claim for which relief may be granted.[4]

---

[4] This holding does not apply to the state law takings claim, because Tennessee has enacted eminent domain and inverse condemnation statutes to implement article I, section 21 of the Tennessee Constitution. *See Phillips v. Montgomery Cnty.*, 442 S.W.3d 233, 243 (Tenn. 2014) (citing Tenn. Code Ann. §§ 29-16-101 to -127 (2012 & Supp. 2013); Tenn. Code Ann. §§ 29-17-101 to -1004 (2012 & Supp. 2013)).

.

2.        *Equal Protection Claim*

The Equal Protection Clause of the U.S. Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. "The clause is 'essentially a direction that all persons similarly situated should be treated alike.'" *EJS Properties, LLC v. City of Toledo*, 698 F.3d 845, 864 (6th Cir. 2012) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)).

The SAC appears to assert what is known as a "class of one" equal protection claim. The Supreme Court has recognized "successful equal protection claims brought by a 'class of one,' where the plaintiff alleges that [1] she has been intentionally treated differently from others similarly situated and [2] that there is no rational basis for the difference in treatment." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (per curiam).

The threshold element of an equal protection claim is disparate treatment. *Scarbrough v. Morgan Cnty. Bd. of Educ.*, 470 F.3d 250, 260 (6th Cir. 2006). To satisfy this element, a "class-of-one equal protection claimant must show not just that [it was] treated differently than others outside of [its] 'class' but that, in comparison to those outside [its] class, [it was] 'similarly situated in all relevant respects.'" *Anders v. Cuevas*, 984 F.3d 1166, 1180 (6th Cir. 2021) (quoting *Johnson v. Morales*, 946 F.3d 911, 939 (6th Cir. 2020)). As for the second requirement, a class-of-one plaintiff "may demonstrate that a government action lacks a rational basis in one of two ways: either by negati[ng] every conceivable basis which might support the government action or by demonstrating that the challenged government action was motivated by animus or ill-will." *Id.* at 1179 (quoting *Warren v. City of Athens*, 411 F.3d 697, 711 (6th Cir. 2005)) (internal quotation marks omitted).

In this case, the "Background" section of the SAC contains no factual allegations—well pleaded or otherwise—regarding the existence of similarly situated comparators. (*See* SAC ¶¶ 9– 33.) Under Count IV, which sets forth the plaintiff's equal protection claim, the SAC asserts:

> Defendants have treated Plaintiff differently from other applicants for building permits, including other applicants owning property in Davidson County zoned for multi-family residential development. On information and belief, during the relevant time period, Defendants have timely reviewed and granted other applicants' development applications in the same manner that they *should have* reviewed and granted Plaintiff's. By singling out Plaintiff for worse treatment without a legitimate legal basis, Defendants have violated Plaintiff's right to equal protection under the law.

(SAC ¶ 54 (emphasis in original).)

In support of its Motion to Dismiss, Metro argues that this allegation is "exactly the type of '[t]hreadbare recital[] of the elements of a cause of action, supported by mere conclusory statements' that the Supreme Court has rejected as insufficient to state a claim." (Doc. No. 25 at 12 (quoting *Iqbal*, 556 U.S. at 678).) In response, the plaintiff argues that its allegations "upon information and belief" are sufficient to satisfy its burden at the pleading stage and that, in the Rule 12(b)(6) context, the standard is whether Owner "undoubtedly can prove no set of facts in support of [its] claim that would entitle him to relief." (Doc. No. 30 at 15 (quoting *Barber v. Charter Twp. of Springfield*, 31 F.4th 382, 386 (6th Cir. 2022)).) The plaintiff asserts that "discovery could yield facts that would support Owner's claim." (*Id.*)

That is simply not the standard that applies to a motion to dismiss under Rule 12(b)(6). As set forth above, the plaintiff always has an obligation to allege actual facts that, if accepted as true, are sufficient to state a claim to relief that is plausible on its face. *Twombly*, 550 U.S. at 555–57. While "detailed factual allegations" are not required, the pleading must contain more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555. The full statement from *Barber*, of which the plaintiff quotes only a fragment, makes this clear:

> "When ruling on a defendant's motion to dismiss on the pleadings, a district court 'must construe the complaint in the light most favorable to the plaintiff, accept all of the complaint's factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claim that would entitle him to relief.'"

*Barber*, 31 F.4th at 386 (quoting *Engler v. Arnold*, 862 F.3d 571, 574–75 (6th Cir. 2017)). In other words, the court must determine whether the facts, as alleged by the plaintiff, state an actionable claim under the law. But those facts must be well pleaded, not conclusory or speculative. The SAC's allegation that Metro has approved other building applications is entirely conclusory.

Moreover, even if the court accepts as true the assertion that, "[o]n information and belief, during the relevant time period, Defendants have timely reviewed and granted other applicants' development applications" (SAC ¶ 54), that statement does not actually indicate what the relevant time period is—nor, more importantly, does it establish that these "other applicants" were similarly situated in all relevant ways to the plaintiff. What is relevant is whether the other applicants were in an area where Metro anticipated construction of a new roadway, such that condemnation proceedings might be required. The SAC contains no allegations regarding other property owners in that situation. The SAC does not allege the existence of similarly situated comparators.

Even if it were able to satisfy the threshold requirement of showing that it was treated differently than similarly situated property owners, Owner has not alleged facts showing that the treatment fails the rational basis test, as necessary to establish the second element of the class-of-one equal protection claim. The SAC does not suggest that the difference in treatment was "motivated by animus or ill-will." *Anders*, 984 F.3d at 1180. Nor do the plaintiff's allegations negate any conceivable rational basis for placing the hold on the plaintiff's Application. To the contrary, the facts as alleged show that a "forthcoming 'major roadway' is being planned for reasons unrelated to Plaintiff's proposed land use." (SAC ¶ 25.) That being the situation, as Metro employees explained to the plaintiff, Metro was "working in partnership with [TDOT] to assess

possible routes for a planned major roadway in the vicinity of [Owner's] property" and anticipated the "need to acquire right of way interests along the selected route." (*Id.* ¶ 17.) As a result, Metro was "defer[ring] review of building permits on potentially affected properties until the assessment is complete."[5] Irrespective of whether, as the plaintiff claims, Metro lacked the discretion to place a "hold" on Owner's permit Application, it clearly had a rational basis for doing so. It would at least arguably be *irrational* to grant a building permit for property that Metro might need to turn around and condemn within a relatively short period of time in order to build a road.

The facts as alleged in the SAC, even if true, do not establish either prong of a class-of-one equal protection claim. This claim will be dismissed for failure to state a claim for which relief may be granted.

### 3. The Takings and Due Process Claims

Metro argues that the plaintiff's takings and due process claims are barred by the applicable one-year statute of limitations. The court finds, as discussed below, that the claims are not time-barred. Instead, they are unripe, having not yet accrued, and must be dismissed without prejudice for lack of subject matter jurisdiction.

### a) The Parties' Arguments

The plaintiff brings its takings claim under both the Fifth Amendment to the U.S. Constitution and article 1, section 21 of the Tennessee Constitution. (SAC ¶ 35.) The parties agree that a one-year statute of limitations governs the plaintiff's takings claims under both federal and state law.[6] Federal law governs the accrual of the federal takings claim. *Dibrell*, 984 F.3d at 1162

---

[5] This statement—referring to other "potentially affected properties"—suggests that similarly situated property owners in the same vicinity *were* being treated the same as the plaintiff.

[6] In Tennessee, the one year statute of limitations set forth in Tenn. Code Ann. § 28-3-104(a)(1)(B) governs federal claims under § 1983. Takings claims under Tennessee law are

(citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)). State law governs the accrual of the state law claim, *Wolfe v. Perry*, 412 F.3d 707, 715 (6th Cir. 2005), but the parties have not argued that state law accrual rules differ from federal accrual rules, so the court addresses this issue solely under federal law.

The defendant asserts that the plaintiff's claims clearly accrued no later than June 29, 2022, the date Owner unequivocally learned that the decision on its Application was indefinitely deferred, thus allegedly rendering the entire Property "worthless," at least temporarily. (Doc. No. 25 at 7.) In its Response, Owner argues that its claims did not accrue on June 29, 2022, or in July 2022 when Owner sent Metro a letter complaining about the hold. Instead, Owner argues that the "continuing violation" doctrine applies, because there was never a single discrete action that triggered the accrual of its claims but, instead, a series of failures to act that has remained ongoing. Alternatively, it asserts that Metro is equitably estopped from asserting a statute of limitations defense, because it affirmatively misled the plaintiff into failing to file suit sooner than it did. As another alternative, Owner argues that, although it believes that Metro's refusal to review its Application was "impermissible from the outset," if the hold *was* initially permissible, then the delay went from permissible to impermissible when the delay eventually became "unreasonable" or "extraordinary." (Doc. No. 30 at 9.) In a footnote, Owner seeks to avoid a potential argument from Metro that its claims are not yet ripe because no final decision has been issued on its Application, asserting that this rule does not apply to "claims based on governmental refusal to make a final decision." (*Id.* at 30 at 6–7 n.2 (citing *Sherman v. Town of Chester*, 752 F.3d 554,

---

governed by the one-year statute of limitations in Tenn. Code Ann. § 29-16-124. *See B&B Enters. of Wilson Cnty., LLC v. City of Lebanon*, 318 S.W.3d 839, 846 (Tenn. 2010).

561–63 (2d Cir. 2014)).) Metro asserts in its Reply that the SAC does not allege facts establishing a continuing violation, a basis for equitable estoppel, or extraordinary delay.

  *b)*  *Accrual and Ripeness of Takings Claims*

Ordinarily, "a takings claim challenging the application of land-use regulations is not ripe"—has not accrued—"unless 'the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue.'" *Palazzolo v. Rhode Island*, 533 U.S. 606, 618 (2001) (quoting *Williamson Cnty. Reg'l Planning Comm'n v. Hamilton Bank*, 473 U.S. 172, 186 (1985), *overruled on other grounds by Knick v. Twp. of Scott*, 588 U.S. 180 (2019)). Although *Knick* overruled *Williamson County*'s state-court-exhaustion requirement, the Supreme Court has recognized that *Knick* "left untouched *Williamson County*'s alternative holding that plaintiffs may challenge only 'final' government decisions." *Pakdel v. City of San Francisco*, 594 U.S. 474, 477 (2021) (citing *Knick*, 588 U. S. at 188). Those courts considering the issue post-*Knick* have likewise continued to hold that "[a]s-applied takings[7] and substantive due process claims are not ripe until a plaintiff receives a final decision regarding the application of the regulations to the property at issue." *Ballard v. City of W. Hollywood*, No. 24-538, 2025 WL 618110, at *1 (9th Cir. Feb. 26, 2025) (citing *Williamson Cnty.*, 473 U.S. at 186); *accord Andrews v. United States*, No. 24-1088, 2025 WL 658212, at *2 (Fed. Cl. Feb. 27, 2025) (same); *Money v. City of San Marcos*, No. 24-50187, 2025 WL 429980, at *2 (5th Cir. Feb. 7, 2025); *Oliver v. Etna Twp.*, 731 F. Supp. 3d 901, 913 (S.D. Ohio 2024) (same).

The Supreme Court has recognized that the finality requirement is "relatively modest. All a plaintiff must show is that 'there [is] no question . . . about how the 'regulations at issue apply to

---

  [7] The finality requirement does not apply to facial challenges to regulations. *Cnty. Concrete Corp. v. Town of Roxbury*, 442 F.3d 159, 164 (3d Cir. 2006).

the particular land in question.'" *Pakdel*, 594 U.S. at 478. (quoting *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 737 (1997)). As the Court explained in *Pakdel*,

> The rationales for the finality requirement underscore that nothing more than *de facto* finality is necessary. This requirement ensures that a plaintiff has actually been injured by the Government's action and is not prematurely suing over a hypothetical harm. Along the same lines, because a plaintiff who asserts a regulatory taking must prove that the government regulation has gone too far, the court must first know how far the regulation goes. Once the government is committed to a position, however, these potential ambiguities evaporate and the dispute is ripe for judicial resolution.

*Id.* at 479 (internal quotation marks, brackets, and citations omitted).

As the plaintiff points out, the finality requirement "is not mechanically applied." *Sherman*, 752 F.3d at 561. A property owner may be "excused from obtaining a final decision" if pursuit of an appeal, for example, would be futile or where government authorities have imposed "repetitive or unfair land-use procedures in order to avoid a final decision." *Id.* Similarly, courts have recognized an exception to the ripeness requirement where regulatory officials take an extraordinarily long time in processing an application for a building permit. *See, e.g.*, *Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 494 2009) ("[A] landowner can maintain a claim for just compensation based on an extraordinary delay, but such a taking accrues only when that delay becomes unreasonable or extraordinary . . . ." (citing *Tabb Lakes, Ltd. v. United State*s, 10 F.3d 796, 803 (Fed. Cir. 1993)); *Aloisi v. United States*, 85 Fed. Cl. 84, 93 (2008) ("An extraordinary delay in permit processing by an agency can give rise to a ripe takings claim notwithstanding the failure to deny the permit." (citations omitted)).

Thus, for example, in *Sherman*, the case cited by Owner, the finality requirement was excused where the plaintiff had been trying for ten years to get approval to develop a subdivision, during which the defendant city had "engaged in a war of attrition," employing "repetitive and unfair procedures" to avoid reaching a final decision, and causing the plaintiff to spend "over $5.5

million on top of the original $2.7 million purchase" to try to satisfy the city's constantly shifting requirements. *Sherman*, 752 F.3d at 563. In finding the finality requirement excused in that case, the court recognized that "[e]very delay in zoning approval does not ripen into a federal claim," that it was often "no simple task to distinguish procedures that are merely frustrating from those that are unfair or would be futile to pursue," but that, "when the government's actions are so unreasonable, duplicative, or unjust as to make the conduct farcical, th[at] high standard is met." *Id.*; *see also Del Monte Dunes at Monterey, Ltd. v. City of Monterey*, 920 F.2d 1496, 1502–06 (9th Cir. 1990) (detailing the plaintiffs' efforts over the course of almost ten years to obtain approval of building proposal and concluding that the plaintiffs had satisfied the finality requirement).

On the other hand, "ordinary" delays in the issuance of building permits are an expected part of the land-use permitting process and do not give rise to a compensable taking. *Tahoe–Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 335 (2002) (noting that "normal delays in obtaining building permits, changes in zoning ordinances, variances, and the like" have "long been considered permissible exercises of the police power" and are therefore noncompensable under the Fifth Amendment); *Richmond Road Partners, LLC v. City of Warrensville Heights*, No. 24-3502, 2025 WL 737342, at *3 (6th Cir. Mar. 7, 2025) ("[M]ere fluctuations in value during the process of governmental decisionmaking, absent extraordinary delay, are 'incidents of ownership. They cannot be considered as a 'taking' in the constitutional sense." (quoting *Agins v. City of Tiburon*, 447 U.S. 255, 263 n.9 (1980), *abrogated on other grounds by Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528 (2005))). Only if the delay becomes "extraordinary" can a taking result. *See Richmond Road Partners*, 2025 WL 737342, at *3 ("When deciding whether a taking occurred under the Fifth Amendment, federal courts regularly apply *Agins*' 'extraordinary delay' standard to administrative decisions."); *Boise Cascade Corp. v.*

*United States*, 296 F.3d 1339, 1352 (Fed. Cir. 2002) ("[A]bsent denial of a permit, only extraordinary delays in the permitting process ripen into a compensable taking.").

The passage of time alone does not determine whether a delay is "extraordinary." *Bass Enters. Co. v. United States*, 381 F.3d 1360, 1366 (Fed. Cir. 2004). The length of any alleged extraordinary delay must be put into context and examined in relation to the regulatory permitting scheme, the nature of the permitting process, and reasons for the delay. *Aloisi*, 85 Fed. Cl. at 93. If the delay is indeed extraordinary, the temporary regulatory takings analysis turns to the three factors outlined in the Supreme Court's holding in *Penn Central Transp. Co. v. New York City*: (1) the regulation's economic effect on the landowner, (2) the extent to which the regulation interferes with reasonable investment-backed expectations, and (3) the character of the government action (the "*Penn Central*" factors). *Penn Cent.*, 438 U.S. 104, 124 (1978). *See Tahoe–Sierra Pres. Council*, 535 U.S. at 321 (addressing whether temporary moratoria on development constituted a taking and concluding that the answer was "neither 'yes, always' nor 'no, never,'" rejecting a categorical takings analysis, and deciding that issue was "best analyzed within the *Penn Central* framework"); *Bass Enters.*, 381 F.3d at 1367 (affirming dismissal of takings claim, finding that forty-five months' delay in issuing drilling permits was not extraordinary and, moreover, that the *Penn Central* factors were not satisfied); *Appolo Fuels, Inc. v. United States*, 381 F.3d 1338, 1351 (Fed. Cir. 2004) ("If the delay is extraordinary, the question of temporary regulatory takings liability is to be determined using the *Penn Central* factors. The eighteen-month delay here is far short of extraordinary." (citation omitted)); *LXR RS V, LLC v. Municipality of Norristown*, No. 2:19-CV-01397-JDW, 2019 WL 4930157, at *4 (E.D. Pa. Oct. 7, 2019) (dismissing takings claim based on the defendant's delay in issuing a "temporary access certificate," where the plaintiff did

not "allege facts that make it plausible that the delay was extraordinary," such that the court had no need to "proceed to an evaluation of the *Penn Central* factors").

There has been no final decision in this case—the plaintiff's Application is on hold. The plaintiff attempts to avoid the logical inference from this fact—that its takings claims have not accrued—by arguing that Metro's decision not to act constituted a taking and that the limitations period did not accrue in June or July 2022, because it has suffered a "continuing violation" that extended the statute of limitations. Generally, where a claim has actually accrued, the doctrine of continuing violations may extend a limitations period. In the Sixth Circuit, a "continuing violation" exists if "(1) the defendants engage in continuing wrongful conduct; (2) injury to the plaintiffs accrues continuously; and (3) had the defendants at any time ceased their wrongful conduct, further injury would have been avoided." *Hensley v. City of Columbus*, 557 F.3d 693, 697 (6th Cir. 2009) (citing *Kuhnle Bros., Inc. v. Cnty. of Geauga*, 103 F.3d 516, 521 (6th Cir. 1997); *McNamara v. City of Rittman*, 473 F.3d 633, 639 (6th Cir. 2007)). In *Hensley*, the court found that the plaintiffs did not allege a continuing violation; instead they alleged that a one time event—the City's digging of a trench in 1992 to extend a sewer pipeline, causing the plaintiffs' wells to run dry. Although the wells stayed dry, the court considered that to be a continuing effect of the City's single act of digging the trench, not a continuing violation. The court contrasted that situation with the fact pattern in *McNamara*, where the plaintiffs alleged that the City's *continued use* of a well it had installed caused them to continue to incur damages to their water supply and that, if the City ceased operations, their water tables would replenish, thus enabling them to avoid further injury. *See Hensley*, 557 F.3d at 697.[8] In *Kuhnle*, the plaintiff trucking company asserted that a county

---

[8] In *McNamara*, however, the court declined to reach the continuing violation theory on the basis that the plaintiffs' claim was unripe under the state exhaustion requirement set forth in

ordinance barring trucking through-traffic on certain roads constituted a taking and that the taking "worked an ongoing violation, so that the limitations period did not begin to run until the defendants lifted the ban." 103 F.3d at 518. The court found that, if a taking occurred at all, the plaintiff's takings claim accrued when the ordinance went into effect and that the statute of limitations barred that claim, as well as the plaintiff's substantive due process claim for deprivation of property. The plaintiff's deprivation of liberty claim, however, inflicted a "continuing and accumulating harm" each day that it was not permitted to use the roads in question. *See Kuhnle Bros.*, 103 F.3d at 622 ("[T]he continued enforcement of an unconstitutional statute cannot be insulated by the statute of limitations." (quoting *Va. Hosp. Ass'n v. Baliles*, 868 F.2d 653, 663 (4th Cir. 1989), *aff'd in part on other grounds sub nom Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498 (1990)).

This case does not resemble those cases the plaintiff cites as supporting the existence of a continuing violation. Here, Metro is alleged to have continued *not to act*. It informed the plaintiff that its building Application was on hold and could not be considered until the roadway assessment was completed. Metro's position in that regard has never changed, and there has never been a final decision on the plaintiff's Application. As set forth above, ripeness generally requires a final decision by the permitting authority. For that reason, the court is not persuaded that the plaintiff's claims accrued in June or July 2022, as Metro argues, or that a continuing violation theory applies to extend the limitations period, as the plaintiff argues. Even though the plaintiff asserts that Metro abused its discretion in refusing to consider its Application and that the Application should have been promptly reviewed and granted as a matter of law, if the plaintiff had attempted to file suit in July 2022, any takings claim would have been deemed unripe, as a delay of less than a month

*Williamson County Regional Planning Commission v. Hamilton Bank*, 473 U.S. 172 (1985), since overruled by *Knick v. Township of Scott*, 588 U.S. 180 (2019).

between the time the plaintiff submitted its Application (apparently in early June 2022) and its receiving confirmation that review of its Application was deferred (on June 29, 2022) would have been considered an ordinary incident of the building permitting process.[9] That is, despite the plaintiff's claim that the Application should have been approved as a matter of right, as set forth above, some delays in the issuance of building permits are a normal and expected part of the land-use permitting process. *See Richmond Road Partners*, 2025 WL 737342, at *4 (stating that, "[i]n the bureaucratic world," a one-year delay between the city's denial of a building permit and the state court's order directing the City to issue the permit was "not extraordinary" as a matter of law); *Res. Invs.*, 85 Fed. Cl. at 509–10 (noting that "[a] year or two of delay, without bad faith, is exceedingly unlikely to be extraordinary"); *LXR RS V, LLC*, 2019 WL 4930157, at *4 ("LXR cannot prevail merely by pointing to a 69-day delay.").

In the alternative to its "continuing violation" theory, Owner alleges that the permitting process ordinarily should have taken less than a year, that Metro repeatedly urged it to be patient, and that, at some point, the delay in review of its Application became unreasonable. In other words, according to Owner, at some point, the delay crossed an invisible threshold between ordinary delay and extraordinary delay, giving rise to a ripe takings claim. (*See* SAC ¶ 29; Doc. No. 30 at 9.)

Metro did not address the issue of a potentially extraordinary delay in its original Memorandum in support of its Motion to Dismiss. In its Reply, it argues that Owner has not alleged facts supporting a finding of extraordinary delay, as it has alleged, "at most, a delay of less than two years," from "the date it learned of the hold (June 2022) through the date it filed this lawsuit (May 2024)." (Doc. No. 34 at 6.) Metro asserts that this delay is too short to qualify as "extraordinary" (*see id.* at 6–7 (collecting cases)) and, moreover, that the plaintiff has not alleged

---

[9] The court, therefore, has no reason to consider the plaintiff's equitable estoppel argument.

facts supporting bad faith on the part of Metro. The court agrees that the plaintiff has failed to allege facts suggesting extraordinary delay.

In the Sixth Circuit, to resolve the question of whether a municipality's delay in granting a building permit is "extraordinary or routine," courts must "weigh all relevant factors, including the length of the delay, bad faith on the part of the government, and any delay that the interestholder's conduct caused," as well, potentially, as the "nature of the permitting process [and] the reasons for any delay. "*Richmond Road*, 2025 WL 737342, at *3 (internal quotation mark and citations omitted). The facts as alleged in the SAC are insufficient to establish an extraordinary delay based on these factors. First, the length of the delay is not one that would necessarily cause raised eyebrows. As set forth above, courts have routinely found much longer delays to be ordinary. The reason for the delay has been made clear to the plaintiff from even before it acquired the Property: that Metro is assessing whether and where to place a roadway in the vicinity of the Property and that it is working with TDOT and other stakeholders to make that assessment. Given the complexity of the issues—as alleged in the SAC—and the fact that numerous other private property interests will inevitably be affected by the decision, the delay at issue here has not thus far become unreasonable. Although the facts as alleged do not suggest that Owner is at fault for the delay, they also do not suggest bad faith on the part of Metro. Specifically, the plaintiff's allegations that Metro's plan regarding the roadway has continued to evolve and that Metro has repeatedly asked the plaintiff's representatives to be "patient" is not evidence of bad faith. Metro's alleged violation of the ordinance that, according to the plaintiff, requires that Owner's Application be granted "as of right" is not sufficient, standing alone, to establish bad faith on the part of Metro. *Accord Aloisi*, 85 Fed. Cl. at 97 ("Violation of a regulation is not *per se* evidence of bad faith sufficient to overcome the presumption of good faith."). Under these circumstances, and even

assuming that the delay is now up to nearly three years from the date the plaintiff submitted its Application, the court finds that the plaintiff's takings claims (under federal and state law) are not yet ripe.

"[T]he ripeness doctrine traditionally incorporates both constitutional and prudential elements." *Carman v. Yellen*, 112 F.4th 386, 400 (6th Cir. 2024) (quoting *Kiser v. Reitz*, 765 F.3d 601, 606 (6th Cir. 2014)). "If a case is 'dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all,' it is not constitutionally ripe." *Id.* (quoting *Trump v. New York*, 592 U.S. 125, 131 (2020) (per curiam)) (some internal quotation marks omitted). Prudential ripeness, on the other hand, "is concerned with (1) whether a claim is fit for judicial review; and (2) the hardship to the parties." *Id.* at 501 (citing *Kiser*, 765 F.3d at 607 & n.2).

In this case, jurisdictional ripeness appears to be at issue, as it remains entirely unclear whether Metro will, in fact, deny the plaintiff's Application and institute condemnation proceedings or, instead, resituate the projected roadway and grant the Application. In any event, the claim is not yet fit for judicial review. While it can at times be "difficult to distinguish between ripeness cases that involve jurisdictional inquiries and those that turn instead on prudential concerns," the court has no need to "delv[e] into these potential complexities because [the plaintiff's] takings claim is unripe," as discussed above, and "it is properly dismissed for lack of ripeness regardless of whether that defect is jurisdictional, prudential, or both." *Doyle v. United States*, No. 2023-1735, 2024 WL 5154019, at *3 (Fed. Cir. Dec. 18, 2024).

The plaintiff's takings claims under both federal and state law will be dismissed without prejudice on ripeness grounds.

c)      *Federal Due Process Claims*

The Sixth Circuit has also held that claims for violations of substantive due process and procedural due process that are "ancillary to a takings claim" are also subject to the same ripeness

requirement. *Peters v. Fair*, 427 F.3d 1035, 1037 (6th Cir. 2005) (citing *Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005)). Owner's substantive and procedural due process claims, like its takings claims, are premised upon allegations that Metro unlawfully delayed issuing a building permit. (*See* SAC ¶¶ 33, 42, 48.)[10] These claims, too, are unripe and will be dismissed without prejudice on that ground.

### B. Kempf's Motion to Dismiss

Kempf seeks dismissal of the claims against her in her individual capacity, first, for the same "reasons outlined" in Metro's Memorandum in support of its own Motion to Dismiss. (*See* Doc. No. 27 at 1.) In addition, she asserts that she is entitled to qualified immunity, as Owner fails to allege sufficient facts showing that she personally was involved in any actions that purportedly gave rise to Owner's claims.

The claims against Kempf in her official capacity are duplicative of the claims against Metro and, therefore, will be dismissed along with the claims against Metro. The only claims Owner brings against Kempf in her individual capacity are the federal equal protection and due process claims. These claims against her are also subject to dismissal on the same grounds as those discussed above: the SAC fails to allege facts that establish a violation of the Equal Protection Clause, and the due process claims are not ripe.

With respect to the equal protection claim (which, being ripe, the court may consider on the merits), the court further notes that the SAC is utterly devoid of any but the most conclusory allegations that the "defendants," collectively, violated the plaintiff's rights. It does not plausibly

---

[10] To be sure, the ripeness problem at issue in *Peters* was the *Williamson County*'s exhaustion requirement that has since been overturned, but the same principles apply to the finality requirement.

plead facts suggesting that Kempf, simply by virtue of her position as Executive Director of Metro's Planning Department, was personally the author or final arbiter of any decision regarding the "hold" placed on the plaintiff's Application. For this reason, too, the SAC fails to state an equal protection claim against Kempf in her individual capacity.

## IV. CONCLUSION

For the reasons set forth herein, both pending Motions to Dismiss (Doc. Nos. 24, 26) will be granted, and the SAC will be dismissed. The takings and due process claims will be dismissed without prejudice for lack of subject matter jurisdiction.

An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge